IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TIMOTHY WILKER,

Defendant.

No. CR11-0109

REPORT AND RECOMMENDATION

TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.   ISSUE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

IV.    RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
       A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
       B.    Written Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
             1.    Stephen Wilker . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
             2.    Chris Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
       C.    Videorecorded Statements . . . . . . . . . . . . . . . . . . . . . . . . . .  4
             1.    Stephen Wilker . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
             2.    Chris Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
       D.    Hearing Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
       E.    Search Warrant Application . . . . . . . . . . . . . . . . . . . . . . . . .  15

V.     DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
       A.    Information Regarding Credibility . . . . . . . . . . . . . . . . . . .  19
       B.    Computer Images Viewed One Year Earlier . . . . . . . . . . . . . .  21
       C.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

VI.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

## I. INTRODUCTION

On the 1st day of November 2011, this matter came on for hearing on the Motion to Suppress and Offer of Proof (docket number 19) filed by the Defendant on October 24, 2011. The Government filed its Resistance (docket number 21) on October 31, 2011. The Government was represented by Assistant United States Attorney Mark A. Tremmel. The Defendant appeared in person and was represented by his attorney, Davis L. Foster.

## II. PROCEDURAL HISTORY

On September 20, 2011, Defendant was charged by Indictment with receipt of child pornography (Count 1) and possession of child pornography (Counts 2, 3, and 4). At the initial appearance and arraignment on September 26, 2011, Defendant entered a plea of not guilty and trial was scheduled for November 28, 2011. Due to the pendency of the instant motion, the trial was continued to January 3, 2012.

On October 24, 2011, Defendant timely filed the instant motion to suppress.

## III. ISSUE PRESENTED

In his motion to suppress, Defendant asks that the Court suppress "any information obtained" during the execution of a search warrant at his residence on May 2, 2009. Defendant asserts that the affidavit submitted in support of the search warrant application omitted material information and, if the omitted information had been included, the application would not have supported a finding of probable cause to issue the warrant.

## IV. RELEVANT FACTS

### A. Background

In the spring of 2009, Defendant Timothy Wilker was living in a trailer home in West Branch, Iowa, with his 17-year-old son, Stephen Wilker. Stephen had been living with Defendant since his parents' divorce, when Stephen was 11 years old. Defendant was employed at the Oral-B Laboratories in Iowa City, working the overnight shift.

At approximately 11:00 p.m. on April 30, 2009, Stephen and his friend, Chris Powers (age 26), went to the West Branch Police Department to report Defendant's

possession of child pornography. When they were unable to locate an officer, they called 911 at approximately 12:30 a.m. on May 1. Some time thereafter, they met with David Bloem, Chief of the West Branch Police Department. Stephen delivered approximately 25 sheets of paper displaying pornographic images, with most pages printed on both sides. That is, there were approximately 50 images. Stephen also delivered a VCR tape, with a second tape delivered later. While at the West Branch Police Department, both Stephen and Powers signed written statements.[1]

Apparently due to the nature of the allegations, authorities in West Branch sought the assistance of the Iowa Division of Criminal Investigation. Special Agents Jason Owens and Jagat Sandu responded. The agents met with Stephen and Powers at the Iowa City Police Department on the evening of May 1, 2009. Owens and Sandu interviewed Stephen, while Iowa City Police Officer Zach Diersen interviewed Powers.[2]

## B. Written Statements

### 1. Stephen Wilker

In his written statement, Stephen states that he has known about his father's possession of "juvenile pornography" and "homemade videos" for "a couple years." According to Stephen, "I was looking for regular porn myself and I knew he had porn." Stephen opened a black cabinet and found "juvenile porn" inside. According to the statement, "[t]he porn that I saw in the black cabinet was pictures of juveniles posing nude." Stephen states that he then continued to look around inside his father's bedroom and "found other under age pictures and videos over the last two years." According to

---

[1] The written statements were introduced at the hearing as Government's Exhibits 2 and 3 (*see* docket numbers 21-3 and 21-4).

[2] Both interviews were videorecorded, and transcripts of the interviews were introduced at the hearing as Government's Exhibits 4 and 5 (*see* docket numbers 21-5 and 21-6).

Stephen's statement, he did not want to get his father "into unwanted trouble," but concluded "I know he needs help though and this will surely get him the help he needs."

According to the written statement, Stephen "gave about 100 juvenile pictures and a homemade tape" to Officer Bloem at around midnight on April 30, 2009. Stephen states that the images produced are evidence of "this situation" from his father's closet, "where he stashes all that I know except for the stuff on his computer which is also juvenile porn." Stephen also states that he took pictures on his cell phone to show where the pornographic images were found.

The typed written statement is signed by Stephen Wilker. It was witnessed by Chris Powers.

### 2.    Chris Powers

In his statement, Chris Powers states that he has known Stephen for about six months. According to Powers, Stephen told him "about 1-3 weeks ago that his dad had under age pornography." Describing the layout of the residence, Powers states that there is "a filing cabenet [sic] full of under age pronography [sic]" in a walk-in closet. According to Powers' statement, "on the shelf is home made video tapes of weman [sic] in a shower & a camera on the toilet so it looks like it is a hiden [sic] camera." According to Powers, the closet also appeared to have a "tv recorder." Powers states that "[t]hen Stephen and I grabed [sic] some files and a tape and left."

Powers' statement is handwritten, although the record is silent regarding whether it is Powers' handwriting, and signed by Powers.

### C.    Videorecorded Statements

### 1.    Stephen Wilker

The interview of Stephen Wilker at the Iowa City Police Department on May 1, 2009, began at 8:17 p.m. and concluded at 9:32 p.m. Initially, Stephen responded to Special Agent Sandu's routine questions regarding his name, date of birth, and address. Stephen advised Sandu that he was a junior at West Branch High School. Stephen then

told Sandu that "I just want to help you guys with this . . . it's just morally wrong."[3] Immediately after that, however, Stephen added "I can't stand him." Stephen then told Sandu that his mom lives in Clarence and "I love mom to death."[4] Stephen also stated that his mom and dad "don't get along."[5]

When asked how he came to talk to the West Branch police chief, Stephen said that he had told his good friend, Chris Powers, about it. Later in the interview, Stephen states that "I was talking to Chris about it and he just got me thinking a different way."[6] According to Stephen, he thinks that his father "needs to get help" and "I'm truly really helping him actually."[7]

Stephen told Special Agent Sandu that he found videos and "there's a giant black cabinet in his closet filled with all those pictures."[8] Stephen stated that "he has a computer with stuff on it too."[9] According to Stephen, Defendant "took the Internet away from me cause, I don't know, he's being retarded, and so I went in the Internet and went on there and stuff and there's some weird like documents on his desktop."[10]

---

[3] *See* Government's Exhibit 4 (docket number 21-5) at 4.

[4] *Id.*

[5] *Id.* at 5.

[6] *Id.* at 25.

[7] *Id.*

[8] *Id.* at 7.

[9] *Id.*

[10] *Id.*

Stephen reported that Defendant has a MAC computer in his bedroom, which is password protected. According to Stephen, "[h]e had his password sitting out."[11] Stephen told Sandu that his father also locked the door to his bedroom, but that "[h]e has [the] key right beside the door."[12]

In response to Special Agent Sandu's questioning, Stephen stated that he saw the pictures on Defendant's computer "probably about a year ago."[13] When asked if "they're still there," Stephen replied: "I don't know, I haven't checked."[14] Stephen said that he had seen a couple of videos and "I don't know, probably half dozen pictures or so, I don't know."[15]

Stephen was then asked whether the videos were "adult videos or . . . or what were they?" Stephen responded that they were "juvenile," adding that "they didn't look over 18 definitely."[16] There was no sex depicted in the videos, with the juveniles instead "just doing what juveniles do."[17] According to Stephen, "some of them struck me as morally wrong when I saw it so it must have been something on them, uh, I can't remember exactly what video's on them."[18]

Special Agent Sandu then followed up with questions attempting to establish the age of the persons depicted in the pictures. After Stephen said "I don't know," Sandu asked

---

[11] *Id.*

[12] *Id.* at 18.

[13] *Id.* at 9.

[14] *Id.*

[15] *Id.*

[16] *Id.* at 10.

[17] *Id.*

[18] *Id.*

"[w]ere they six, seven, eight, three, ten, what are you thinking?"[19] Stephen stated "I'm guessing five to nine."[20] All of the children depicted on the videos were girls.

When asked about his relationship with his father, Stephen responded "thanks to me not that good."[21] Stephen stated that "I usually ignore him most of the time."[22] When asked why he did not like to "hang out" with his father, Stephen said "[b]ecause it just creeps me out and every time he ends up yelling and shit over some stupid reason."[23] Stephen advised Special Agent Sandu that he was "on probation at the moment," which his father would "always bring up."[24] Sandu did not ask why Stephen was on probation or with whom.

Stephen then disclosed that he had found two cameras hidden in his father's bathroom. The first, which Stephen found four months earlier, was hidden in a curtain and aimed toward the toilet.[25] The second camera, which Stephen discovered the previous night, was on top of the toilet facing the shower.[26]

Stephen was asked about his father's girlfriends and he told Special Agent Sandu that one of them had a four or five-year-old boy. Stephen had never seen his father take pictures of the child, however, and Stephen denied that his father had ever taken nude pictures of him or his friends.

---

[19] *Id.* at 11.

[20] *Id.*

[21] *Id.* at 13.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 14.

[25] *Id.* at 16-17, 34, 45.

[26] *Id.*

When asked where his father kept "his stash," Stephen said it was in the bedroom closet "right beside his normal porn."[27] According to Stephen, he discovered it when he "went in there one time when I was younger to look for porn."[28] Stephen stated that he knew this had been "going on" for a couple of years.[29] The only persons Stephen told were his girlfriend and Chris Powers.

Stephen was then asked "what made you decide to go to the police?" Stephen responded that "the reason why [I] didn't want to go in the first place was because he is my father."[30] According to Stephen, he "realized a couple of days ago" that his father "needs to get help."[31] Stephen stated that "I was talking to Chris about it and he just got me thinking a different way."[32] Stephen opined that his father "might just take the pictures for now, but, you don't know how long that's going to last."[33] Stephen added "if he done something like this I don't know if it can escalate."[34]

Later in the interview, Stephen was asked whether he had looked through everything in the closet. Stephen responded that he had not, but "I just know that the cabinet's full

---

[27] *Id.* at 23.

[28] *Id.*

[29] *Id.* at 24.

[30] *Id.*

[31] *Id.* at 25.

[32] *Id.*

[33] *Id.*

[34] *Id.*

of it."[35] Stephen told Special Agent Sandu that "[t]here's going to be a lot" of pictures of young girls.[36]

Midway through the interview, Stephen was asked about his relationship with his mother. When his parents were first divorced, Stephen would see his mother every Wednesday and every other weekend.[37] Then there was a period of time when he didn't see her as much, but during the year preceding the interview "I think I started seeing her almost every single day" and was "[s]taying there with her almost every night just because I like hanging out with her."[38] Stephen's mother moved to Clarence with her boyfriend a couple of months prior to the interview, however, and Stephen had not seen her as much since that time.[39] After discussing his father's work schedule, Stephen volunteered that he had been "meaning to talk to someone about this" and would like to change custody over to his mother.[40]

Stephen was then asked additional questions by Special Agent Owens. Stephen told Owens that he had a computer until it was "fried" about a year earlier.[41] According to Stephen, it was at that time that his father obtained the MAC.[42] In response to questioning by Owens, Stephen stated that there were pictures and videos on the computer. According to to Stephen, however, the video which he saw showed a four or five-year-old girl, fully

---

[35] *Id.* at 30.

[36] *Id.* at 31.

[37] *Id.* at 34.

[38] *Id.* at 35.

[39] *Id.*

[40] *Id.* at 37-38.

[41] *Id.* at 39.

[42] *Id.* at 40.

clothed, "just acting like a kid, I guess."[43] That is, the child was playing and did not have any clothes off or her private area exposed.[44] Stephen told the agents that he saw "nude" pictures, but the subjects were not engaging in any sex act.[45] Stephen was able to access the pictures from the desktop, and he did not "delve" into any "saved files."[46] Stephen stated, however, that "I haven't used that computer since I used to sneak in to use it for Internet . . . when my computer broke down in my room" about a year prior to the interview.[47] According to Stephen, he would access the Internet to play a video game.[48]

Under further questioning by Special Agent Sandu, Stephen disclosed he "might have" accessed adult pornography on his father's computer.[49] When asked later whether he "rifle[d] through all the pictures" in Defendant's closet, Stephen initially responded "no."[50] When Sandu suggested that the pictures may be fingerprinted, Stephen stated "[w]ell, I touched them."[51] Despite hard questioning by Sandu, however, Stephen repeatedly denied printing out any of the pictures found in Defendant's cabinet.[52]

Special Agent Sandu then inquired further regarding Stephen's relationship with his father:

---

[43] *Id.* at 41-42.

[44] *Id.* at 42.

[45] *Id.* at 43.

[46] *Id.*

[47] *Id.*

[48] *Id.* at 44.

[49] *Id.* at 47-48.

[50] *Id.* at 49.

[51] *Id.*

[52] *Id.* at 50-52.

JS: Have you ... have you gotten into any huge arguments with your dad recently?

SW: Oh, I get into them all the time.

JS: Okay. So, but nothing out of the ordinary? Lately?

SW: Um, yeah, actually a couple of days ago ...

JS: Yeah, what happened?

SW: ... he said if I wasn't back before he ... he went to work he was going to put me in a boys home. That was ...

JS: Okay.

SW: ... I ... I was talking to him about staying with a friend that night because I did not want to stay there.

JS: Mm hmm.

SW: He lives in town, I was going to go to school the next day.

JS: Okay.

SW: I figured it'd be fun. He said no and I was like all right, whatever, I left. If I wouldn't have came back he'd put me in a boys home. But, that's just him. He always likes to make threats like that.

See Government's Exhibit 4 (docket number 21-5) at 53-54.

When asked whether he was motivated by trying to "get back at" his father, Stephen responded that "he's pissed me off so many times" that if that was his motivation, "I'd a done it years ao."[53]

---

[53] *Id.* at 54-61.

## 2. Chris Powers

While Stephen Wilker was being interviewed at the Iowa City Police Department by Special Agents Sandu and Owens, Chris Powers was being interviewed in another room by Officer Zach Diersen of the Iowa City Police Department. Powers, age 26, told Diersen that he had been a friend of Stephen Wilker for approximately six months.[54]

Powers told Officer Diersen that Stephen told him about four months ago that his dad was a "creeper." When asked to explain what he meant by being a "creeper," Powers said he "looks at girls, you know, young girls."[55] Powers stated that Stephen "kept running away" from his dad's house, and that on one occasion a police officer came to Powers' house looking for Stephen.[56]

According to Powers, Stephen kept telling him that his dad had child pornography and Powers "was a little skeptical about it at first."[57] On the night prior to the interview, however, Powers went to Stephen's house "and after he showed me all that stuff I'm like . . . and I was like dude we gotta go to the cops dude, this is not right, you know."[58] Powers claimed that "he pulled up probably little . . . little girls like seven, you know, eight, you know, nine and I mean I think I seen one that was like two."[59] According to Powers, the two-year-old "wasn't clothed, she was actually taking a shower; she had like her leg up . . . up like she was washing her leg or something."[60] Powers told Officer

---

[54] *See* Government's Exhibit 5 (docket number 21-6) at 3.

[55] *Id.* at 4.

[56] *Id.*

[57] *Id.* at 5.

[58] *Id.* at 6.

[59] *Id.*

[60] *Id.* at 7.

Diersen that this was a "homemade video" and that Defendant had hidden cameras in his bathroom.[61] When Diersen attempted to follow up by asking "are there children there that are being videotaped," Powers said "oh, no I don't know. I have no idea about that part."[62] According to Powers, Stephen had told the officer "last night that there was a computer on that had . . . uh . . . pornography . . . children pornography on it like videos."[63]

Powers described the layout of Defendant's bedroom and stated that "straight back is the file cabinet full of children pornography."[64] According to Powers, there were eight to ten tapes "off to the left" and "we grabbed two."[65] According to Powers, "I told him, I said we gotta go to the cops."[66] Powers told Diersen that Stephen "grabbed a bunch" of the pictures from the filing cabinet and took them to the police station.[67]

### D. Hearing Testimony

At the time of hearing, the Government offered, without objection, the search warrant documents (Exhibit 1), Stephen Wilker's written statement (Exhibit 2), Chris Powers' written statement (Exhibit 3), a transcript of Stephen Wilker's recorded interview (Exhibit 4), and a transcript of Chris Powers' recorded interview (Exhibit 5). The Government also called Special Agent Jason Owens of the Iowa Division of Criminal Investigation (DCI) to testify.

---

[61] *Id.*

[62] *Id.* at 8, 11.

[63] *Id.*

[64] *Id.* at 9.

[65] *Id.* at 10.

[66] *Id.* at 11.

[67] *Id.* at 18.

Special Agent Owens testified that when Stephen and Powers initially appeared at the West Branch Police Department, they brought in about 25 sheets of paper on which there were images of pornography, with several of those sheets printed on both sides. They also brought in a VCR tape, with a second tape brought in by Stephen later. According to Owens, some of the pornographic images depicted adults, some depicted children, and "several of the images were close-up shots of genitalia, so that I was not able to make an age determination." Owens identified two images which were "definitely" child pornography.

At the time of hearing, the Government initially sought to introduce the two images of child pornography as exhibits 6 and 7. Defendant stipulated, however, that the images constituted child pornography. The parties further stipulated that each of the images had an internet address printed at the bottom, and a date printed at the top. One image is dated 4/6/04 8:43 AM, and the second image is dated 4/8/04 8:15 AM. The Government also initially intended to offer a videotape as exhibit 8. The parties stipulated that the video is marked with the letters NA, and is accurately described on page 2 of the affidavit submitted by Special Agent Owens in support of the search warrant application. Given the parties' stipulation regarding the content of exhibits 6, 7, and 8, the Government withdrew its request to introduce those items as exhibits.

Special Agent Owens testified that after the interviews of Stephen and Powers were completed, he discussed the case with Special Agent Sandu and Detective Diersen, and made a phone call to his supervisor, Special Agent in Charge Gerald Meyer. It was decided to seek a warrant to search Defendant's residence. After Owens completed the search warrant application and supporting affidavit, he and Sandu went to the home of the Cedar County Attorney, Sterling Benz, who co-signed the application. The agents then went to the home of the judicial magistrate, Stuart Werling, who issued the search warrant at approximately 2:30 a.m. on May 2, 2009.

When asked why they sought a search warrant in the middle of the night, Special Agent Owens gave two reasons. First, Owens believed that they "might have a manufacturing of child pornography case going" and was concerned about "actual hands-on victims." According to Owens, if they have "any indication of that, then we are going to act much more quickly than in a normal child pornography investigation." Second, Owens was concerned about the possible "destruction of potential evidence." Specifically, Owens reasoned that if Stephen had been seen going to the local police department, that information may get back to Defendant before a search could be executed on the property.

Special Agent Owens acknowledged that he did not include any information in the search warrant application regarding "problems" which Stephen was having with his father, nor did he include the fact that Stephen had last seen the images on the computer "about a year ago." Also, the application did not include any information regarding Chris Powers. When asked why this information was not included in the search warrant application, Owens responded that this was "a little bit more of a heightened investigation" and that they were "trying to act quickly." According to Owens, he was "trying to stick to the bare facts of the case that were pertinent to the probable cause."

### E. Search Warrant Application

Copies of the application for search warrant, supporting affidavit, and the search warrant were introduced at the hearing as Government's Exhibit 1. Defendant does not claim that there are any technical or procedural defects in the application or the warrant.

Special Agent Owens' supporting affidavit disclosed the following facts:

1.     On May 1, 2009, Special Agent Owens was notified of a request from the West Branch Police Department for assistance with a case of possession of child pornography.

2.     Information was received by law enforcement from Stephen Wilker, the 17-year-old son of Timothy Wilker.

3.  Stephen provided authorities with a VCR tape and numerous photographs of nude and partially nude females.

4.  Two of the photographs appeared to be child pornography.

5.  The photographs appeared to have been printed from a computer.

6.  According to Stephen, Timothy Wilker has a MAC computer in the master bedroom of his residence.

7.  Stephen stated that the items were found in the closet of the master bedroom.

8.  Stephen stated that the VCR tape contained video taken from cameras secretly located in the master bathroom.

9.  On May 1, 2009 at approximately 8:17 p.m., Owens and Special Agent Jagat Sandu interviewed Stephen at the Iowa City Police Department.

10. Stephen told the agents that there is a MAC computer located in the master bedroom.

11. Stephen stated that he observed images of nude kids with an approximate age range of 5-9 years old.

12. Stephen brought a second VCR tape to the interview.

13. Stephen located two hidden wireless cameras in the master bathroom.

14. The first hidden camera was in a shower curtain pointed towards the toilet.

15. The second hidden camera was located above the toilet pointing toward the shower.

16. Stephen provided law enforcement with another VCR tape from the VCR located inside the master closet.

17. It is believed that the wireless cameras in the bathroom are recorded onto this VCR.

18. Special Agent Owens reviewed the pictures that Stephen provided to the West Branch Police Department and concluded that two images are child pornography.

19. The first image depicts a partially-clothed pre-pubescent female graphically displaying her genitalia.

20. The second image is described by its web address (including a reference to lolitasCastle), but not by its content.

21. On May 1, 2009, Special Agent Owens reviewed two VCR tapes provided by Stephen that were taken from his father's residence.

22. The first tape, marked on the outside NA, contains video of adults using the toilet in the master bedroom. The buttocks of two unidentified adults can be seen in the video.

23. The videotape marked NA also shows a pre-pubescent male whose genitalia are clearly visible.

## V. DISCUSSION

Initially, it should be noted that Defendant does *not* claim that the affidavit submitted in support of the search warrant application failed to establish probable cause for the issuance of the warrant. That is, Defendant apparently concedes that the search warrant for his residence was supported by probable cause found in the affidavit. Instead, Defendant argues that material information was omitted from the affidavit which, if it had been included, would have defeated probable cause. Specifically, Defendant asserts Special Agent Owens recklessly omitted information affecting Stephen's credibility and information regarding when the computer was last viewed.[68]

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Court held that if a defendant establishes by a preponderance of the evidence that a sworn statement used by police to procure a search warrant contained perjury or reckless disregard for the truth, then the Court must determine whether the affidavit's remaining content is sufficient to establish probable cause. If not, then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the

---

[68] *See* Defendant's Brief (docket number 19-1) at 1.

affidavit." *Id.* at 156. *Franks* also applies to material that has been "deliberately or recklessly omitted from a search-warrant affidavit." *Untied States v. Scott*, 610 F.3d 1009, 1013 (8th Cir. 2010).

In resisting Defendant's motion to suppress, the Government first argues that Defendant failed to make the "substantial preliminary showing" necessary to entitle him to a hearing on the merits ("a *Franks* hearing").

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks,* 438 U.S. at 171-72.

In the context of alleged material omissions, this means that a *Franks* hearing is justified only if the omitted information may have made "a probable cause finding unsupportable." *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007). In *Williams*, information from a confidential informant ("CI") was used to obtain a search warrant for the defendant's residence. The affidavit submitted in support of the search warrant application omitted information regarding a plea bargain with the CI and omitted information regarding the CI's criminal background. The magistrate judge found that the officer intentionally omitted the information, but that even had the information not been omitted, the affidavit would still have provided probable cause for the warrant. *Id.* at 556. The district court adopted the magistrate judge's view. The Eighth Circuit Court of Appeals affirmed, but also concluded that the defendant "failed to make a substantial preliminary showing sufficient to justify a *Franks* hearing." *Id.* at 560.

> In its order granting the *Franks* hearing, the magistrate judge found that the defendant made a substantial preliminary

> showing that Officer Wells may have omitted information from
> the search warrant affidavit with a reckless disregard for the
> truth. Such a finding alone is legally insufficient to justify a
> *Franks* hearing absent a determination that the intentionally or
> recklessly omitted information may have rendered the affidavit
> misleading and may have otherwise made a probable cause
> finding unsupportable.

*Id.* at 558.

Here, Defendant argues that Special Agent Owens recklessly omitted information when he failed to include facts regarding Stephen's credibility, and when he failed to disclose that Stephen last viewed the images on the computer one year earlier. As set forth in *Williams*, however, even if the information was omitted with a reckless disregard for the truth, Defendant is not entitled to a *Franks* hearing unless inclusion of the omitted information would have made "a probable cause finding unsupportable." *Id. See also United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) ("'*Only* if the affidavit as supplemented by the omitted material *could not* have supported the existence of probable cause' will suppression be warranted.") (quoting *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986)). Accordingly, the Court must address the omitted information and determine whether its inclusion in the affidavit would have made a probable cause finding unsupportable.

### A. Information Regarding Credibility

First, Defendant argues that Special Agent Owens recklessly omitted information regarding Stephen's credibility. Specifically, Defendant argues that the judicial magistrate should have been told that Stephen's relationship with his father is "not that good," that Stephen was on probation, that he wanted to switch custody to his mother, that he never wants to speak to his father, and that during an argument a couple of days earlier the Defendant threatened to put Stephen in a boys home.[69] The Court must determine whether inclusion of these additional facts would have defeated a finding of probable cause.

---

[69] *See* Motion to Suppress (docket number 19) at 2.

The affidavit advised the judicial magistrate that Stephen Wilker, age 17, found numerous photographs of nude and partially nude females in the closet of his father's bedroom. Stephen provided a sampling of the photographs to authorities, which included two images of child pornography which appeared to have been printed from a computer. The magistrate was told that there was a computer located in the master bedroom. The magistrate was also advised that Stephen had located two hidden wireless cameras in the master bathroom. Stephen brought in two VCR tapes corroborating his observation. One of the tapes showed a pre-pubescent male whose genitalia was clearly visible.

Special Agent Owens knew that Stephen and his father had a poor relationship. Stephen disclosed repeatedly that he did not get along with his father and wanted to live with his mother. Even if this information had been provided to the judicial magistrate, however, it would not have defeated a finding of probable cause. Stephen did not merely describe the existence of pornography in his father's closet, or claim the existence of hidden cameras in the bathroom. Instead, Stephen also produced two images of child pornography taken from his father's closet, and produced two tapes which showed images consistent with a hidden camera in his father's bathroom, including a tape showing a pre-pubescent male's genitalia. Whether Stephen brought the items to the attention of authorities because he wanted to "help" his father, or whether he acted out of animus toward his father, is largely irrelevant. Even if the judicial magistrate had been advised of Stephen's poor relationship with his father, probable cause to search would nonetheless exist.

In making a probable cause determination, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Here, the source of the information was known, officers conducted an

extensive interview with the source, Stephen lived at the residence and provided substantial detail and his information was supported by production of the images of child pornography and the VCR tapes. Disclosure of Stephen's rocky relationship with his father would not have rendered probable cause "unsupportable." *Williams*, 477 F.3d at 558.

## B. Computer Images Viewed One Year Earlier

Defendant also argues that probable cause to search Defendant's computer would have been lacking if the judicial magistrate had been told that Stephen last viewed the computer one year earlier. According to the affidavit, Stephen told agents that there is a computer in the master bedroom and that he observed images of nude kids with an approximate age range of 5-9 years old. The affidavit is silent regarding when that observation was made. The affidavit also advises the judicial magistrate that the two images of child pornography found in Defendant's closet appeared to have been printed from a computer. The affidavit does not disclose that they were dated approximately five years earlier.

It is necessary to consider the information regarding the computer in a broader context. The affidavit also discloses that pornographic images, including child pornography, could be found in Defendant's master bedroom. The judicial magistrate was also advised that two hidden wireless cameras were found in the master bathroom, with a VCR tape showing a pre-pubescent male whose genitalia are clearly visible. The images of child pornography appeared to have been printed from a computer, and Stephen observed images on the computer of nude young children.

Defendant concedes that the affidavit establishes probable cause to search the computer found in his bedroom. Defendant argues, however, that if the judicial magistrate had been told that Stephen had last viewed the computer one year earlier, probable cause would be defeated. This issue must be decided in conjunction with all of the other information provided to the magistrate. That is, the search warrant application was not limited solely to the computer. The affidavit established that Defendant was in current

possession of images of child pornography (apparently printed from a computer) and a VCR tape – apparently made with a hidden camera – showing a pre-pubescent male whose genitalia are clearly visible. Under these circumstances, the Court concludes that even if the judicial magistrate had been told that Stephen had last viewed the computer one year earlier, it would not have defeated a finding of probable cause to search the computer.

There is no bright-line test for determining when information is stale. *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002). "Time factors must be examined in the context of a specific case and the nature of the crime under investigation." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007). The Court in *Summage* found that "it could be presumed" that Summage would maintain possession of certain sexual images and, thus, "the affidavit's failure to include the date of that encounter is not fatal to a determination that probable cause existed for a search of Summage's new residence." *Id.* *See also United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999) ("The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation; the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated.").

Even if the judicial magistrate had been told that Stephen had seen the images on the computer one year earlier, the magistrate knew that Defendant had a continuing interest in child pornography, as evidenced by the printed images and the VCR tape described in the affidavit. It is common knowledge that persons who collect child pornography often retain the materials for long periods of time. Here, the magistrate was told that Defendant had printed images of child pornography and a homemade VCR tape showing a pre-pubescent male whose genitalia are clearly visible, and that images of nude children were observed on Defendant's computer. Under these circumstances, the Court concludes that probable cause existed to search the computer, even if the judicial magistrate had been told that the observation of the computer had been one year earlier. *See United States v.*

*Freeman*, 2010 WL 4386897 *10-11 (D. Minn. 2010) (collecting cases regarding whether information to search for child pornography is stale).

### C. Summary

In summary, the Court concludes that even *if* additional information regarding Stephen's credibility and when the computer was last viewed by Stephen were recklessly omitted from Special Agent Owens' affidavit, the affidavit was not misleading and the inclusion of the additional information would not have made "a probable cause finding unsupportable." *Williams*, 477 F.3d at 558. Accordingly, Defendant failed to make a substantial preliminary showing sufficient to justify a *Franks* hearing and the motion to suppress should be denied. *Id.* at 559.

The Court also notes parenthetically that even after having been given a *Franks* hearing, Defendant is unable to meet his burden of proving by a preponderance of the evidence that the omissions were intentional or in reckless disregard of the truth. An intentional omission occurs when an officer "deliberately omit[s] vital information necessary to the magistrate judge's determination of probable cause." *Jacobs*, 986 F.2d at 1233. Defendant offers no evidence that Special Agent Owens "intentionally" failed to disclose information regarding Stephen's relationship with his father or the length of time since the computer was last viewed. Owens testified at the hearing that he was "trying to act quickly" and, therefore, was "trying to stick to the bare facts of the case that were pertinent to the probable cause." Moreover, the omitted information was not "vital" to a probable cause determination. Even if Owens was negligent in failing to include the additional information, "[a]llegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood." *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010). While it may be inferred that an officer "recklessly" omitted information from an affidavit if "the omitted material would be clearly critical to the finding of probable cause," *Jacobs*, 986 F.2d at 1235 (quoting *United States v. Reivich*,

793 F.2d 957, 961 (8th Cir. 1986), the Court has concluded above that the omitted material would not be clearly critical to a finding of probable cause.

## VI.  RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the motion to suppress (docket number 19) filed by the Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court.  *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."  Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on November 1, 2011.*

DATED this ___8th___ day of November, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

24